**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| ELIZABETH WOODBERRY, | ) | |
| | ) | |
| Plaintiff, | ) | No. 2:12-cv-1872-DCN |
| | ) | |
| vs. | ) | |
| | ) | **ORDER** |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

This matter is before the court following a bench trial held on April 28, 29, and 30, 2014. Based on the evidence presented and heard on those dates, the court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## I.   FINDINGS OF FACT

1.     Plaintiff Elizabeth Woodberry ("Woodberry") was 62 years old at the time of the trial and resides in Hemingway, SC. Tr. 86–87. She is divorced with two children, Tiffany and Harold. Id.

**A.     Motor Vehicle Accident**

2.     On August 10, 2009, Woodberry and her nine-year-old granddaughter were traveling on Highway 261 from Georgetown, SC to Hemingway, SC. Tr. 18, 97. Woodberry was going to her place of work, Prince George Health Care Center, to sign insurance documents. Tr. 97. It was daytime around 1:00 p.m. and the weather was clear when the accident occurred. Tr. 18, 37. At the relevant time, Woodberry was driving the

1

speed limit, which is 55 miles per hour.  Tr. 20, 102.  Woodberry was driving an Acura.  Tr. 98, 103.

3.    Leslie Richardson ("Richardson"), a United States Postal Service employee, was driving in the opposite direction from Woodberry delivering mail.  Tr. 19.  Witness Lisa Klettke ("Klettke"), who does not know either Woodberry or Richardson, was behind Richardson driving in the same direction.  Tr. 19.  When Klettke first saw Richardson's car, Richardson was stopped at a mailbox and was halfway on and halfway off the road.  Tr. 19.  The mailbox was between two car lengths and 100 feet down Highway 261 from its intersection with Frank Cribb Road.  Tr. 40, 46.  Both Klettke and Woodberry saw Richardson, were aware that she was a mail carrier, and acknowledged the need to be cautious around mail vehicles.  Tr. 28, 147, 152.

4.    Klettke noticed Richardson looking at her lap, presumably at the mail she was delivering, and looking back up as she pulled back onto the road.  Tr. 19, 28.  When she pulled out into the road, Richardson was approximately one and a half car lengths ahead of Klettke, who was travelling 55 miles per hour.  Tr. 23–24.  Richardson then proceeded to attempt a left turn onto Frank Cribb Road without stopping or applying her brakes.  Tr. 20, 23.  Klettke does not recall seeing Richardson's turn signal, and no evidence was introduced that Richardson had her turn signal on.  Tr. 24.  While making the turn, Richardson's car struck Woodberry's car, which was passing the intersection traveling in the opposite direction.  Tr. 20, 100.  Woodberry did not have enough time or distance to stop or slow down in order avoid the collision.  Tr. 20, 99–100, 151.  There was no evidence of skid marks or gouge marks on the road.  Tr. 47.

### B.     Medical History

5.     Klettke indicated that Woodberry was "disoriented" and in a lot of pain following the collision.  Tr. 24–25.

6.     Woodberry was transported by ambulance to Georgetown Memorial Hospital.  Tr. 104–05.  When she arrived at Georgetown Memorial, Woodberry was still "in shock" and had pain in her right leg.  Tr. 105.  Additionally, Woodberry testified that she was hurting "[a]ll over" and that her "whole body was aching."  Tr. 106.  Woodberry had bruises on her side and lower back.  Tr. 106.

7.     The same day, Woodberry was transferred from Georgetown Memorial to the Medical University of South Carolina ("MUSC") by ambulance.  Hartsock Dep. 9; Tr. 105–07.  On arrival at MUSC, Woodberry was "out of it."  Tr. 106.  She was not able to rest and was on a lot of pain medication.  Tr. 108.

8.     At MUSC, Dr. Langdon Hartsock ("Dr. Hartsock"), a board-certified orthopedic surgeon, treated Woodberry.  Hartsock Dep. 6–9.  Dr. Hartsock diagnosed Woodberry with a tibial plateau fracture, which is a fracture of the upper part of the shin bone where it meets the knee joint.  Hartsock Dep. 9.  On August 13, 2009, Dr. Hartsock performed an open reduction and internal fixation of Woodberry's right tibial pleateau fracture.  Tr. 9–10.  He considered the surgery to be successful.  Tr. 10.  Woodberry was given oral analgesic medications for pain at discharge.  Tr. 10.

9.     After being discharged from MUSC, Woodberry was taken to Carolinas Hospital in Florence, SC for inpatient rehabilitation, where she remained for approximately three weeks.  Tr. 108, 224.  Following her discharge from Carolinas,

3

Woodberry took narcotic pain medication.  Tr. 113.  However, she was still having problems sleeping at night due to pain.  Tr. 113.

10.     Soon after being discharged from Carolinas, Woodberry began going to physical therapy at Three Rivers Therapy Associates in Hemingway as prescribed by Dr. Hartsock.  Tr. 113; Hartsock Dep. 12, 48.  Woodberry was treated at Three Rivers by Dr. Stacy Lawrimore Howell ("Dr. Howell"), a physical therapist and co-owner of Three Rivers.  Tr. 221–23.  Dr. Howell first treated Woodberry on October 12, 2009.  Tr. 224.  At her first visit, Woodberry complained of intermittent pain in her right knee and rated the pain 10 out of 10.  Tr. 225.  Woodberry also experienced decreased range of motion with right knee flexion, decreased strength, and increased girth in her right knee.  Tr. 225.  Dr. Howell thought that Woodberry was being sincere with her efforts, Tr. 228, and indicated that Woodberry was compliant with treatment and came to all or most of her appointments.  Tr. 227.  During this initial course of treatment, Dr. Howell saw Woodberry 65 times.  Tr. 227.  When Woodberry was discharged on July 7, 2010, her range of motion was within normal limits for right knee extension, but not knee flexion, her pain rating was 5 out of 10, and she had increased strength in her knee.  Tr. 227–30.  Woodberry indicated that physical therapy helped.  Tr. 114.

11.     Following her initial visit to MUSC, Woodberry had several outpatient visits with Dr. Hartsock.  Tr. 114.  At these appointments Woodberry would often see a nurse practitioner, but Dr. Hartsock reviewed the notes and saw her at least briefly at each appointment.  Hartsock Dep. 46.  In the early visits, Dr. Hartsock noted that Woodberry's fracture was healing, she was recovering normally, and her strength was getting better, although she continued to complain of pain at the fracture site.  Hartsock

Dep. 12–15, 52, 55.  In the fall of 2010, Woodberry could not stand on her right leg because she was having very sharp pain.  Tr. 115.  During an August 12, 2010 visit, Woodberry and Dr. Hartsock decided to remove the hardware from her initial surgery because of the continued pain.  Hartsock Dep. 24.  On October 18, 2010, Dr. Hartsock surgically removed the hardware from her knee.  Hartsock Dep. 25.  Dr. Hartsock indicated that the procedure went well and that there were no complications.  Hartsock Dep. 26, 63–64.  Woodberry testified that removing the hardware helped relieve her pain. Tr. 115.

   12. Following the removal of the hardware, Dr. Hartsock diagnosed Woodberry with posttraumatic osteoarthritis of the knee.  Hartsock Dep. 27.  Dr. Hartsock indicated that posttraumatic arthritis is painful and causes stiffness, a limp, and a decreased ability to function.  Hartsock Dep. 65.  Dr. Hartsock also noted some irregularity of the joint surface and a very mild varus alignment, meaning that Woodberry was slightly bowlegged.  Hartsock Dep. 27.  When Woodberry's knee continued giving her problems, Dr. Hartsock informed her that she could consider an injection or knee replacement surgery.  Hartsock Dep. 28–29.  On May 8, 2012, Woodberry continued to have pain in her knee.  Hartsock Dep. 30.  Dr. Hartsock diagnosed patellofemoral crepitation—grinding between the kneecap and thighbone—and posttraumatic arthritis. Hartsock Dep. 30–31.  At that visit, Dr. Hartsock administered a cortisone injection. Hartsock Dep. 31, 71.  Woodberry testified that the injection "helped a little" and provided between three and four weeks of relief.  Tr. 119.  Woodberry last saw Dr. Hartsock in May 2012.  Hartsock Dep. 31–32.

13.     Since the accident, Woodberry has continued to see her primary care physician, Dr. Kenneth M. Faile ("Dr. Faile").  Tr. 109.  Dr. Faile has treated Woodberry for anxiety, inflammation, pain, and not being able to sleep.  Tr. 109–10.  Woodberry indicated (and medical records show) that Dr. Faile started giving Woodberry prescriptions for pain as early as September 2009.  Tr. 194; Def.'s Ex. 28.

14.     On April 15, 2013, Woodberry began another round of physical therapy at Three Rivers, which Dr. Faile prescribed.  Tr. 230–31.  Woodberry still could not put much pressure on her right leg.  Tr. 231.  Woodberry rated her right knee pain as 9 out of 10 and had decreased active range of motion with right knee flexion.  Tr. 233.  Dr. Howell saw Woodberry twice a week for four weeks, during which time Woodberry was again compliant and put forth sincere effort.  Tr. 233–34.  Woodberry was discharged from the second round of physical therapy on May 22, 2013.  Tr. 235.  On discharge, she had decreased pain in her right knee (6 out of 10), decreased swelling, and no significant change in range of motion.  Tr. 235.  Dr. Howell believed both the first and second rounds of physical therapy to be medically necessary.  Tr. 230, 235.  Woodberry indicated that the second round of physical therapy also helped.  Tr. 125.

15.     Woodberry testified to having a variety of medical conditions prior to the accident, including heartburn/gastritis, high blood pressure, issues with stress, chest pain, and sinusitis.  Tr. 174–76, 180; see also Def.'s Ex. 28.  When she was busy at work she would occasionally get light-headed and dizzy and nurses would sit down and check her blood pressure.  Tr. 177.

### C.    Activities of Daily Living

16.    By all accounts, Woodberry worked and had an active lifestyle before the accident.  Tr. 62.  She is now unable to do many things she used to be able to do.  Tr. 73.

17.    Woodberry has an extensive work history, including her most recent job as a certified nursing assistant ("CNA") at Prince George beginning in 2006.  Tr. 90.  As a CNA, Woodberry helped bathe, clean, and change the clothes of sick and elderly people, among other things.  Tr. 91.  It was physically demanding work, and included lifting patients and helping them walk.  Tr. 91.  Woodberry "loved" being a CNA and would often work overtime.  Tr. 91–92.  Woodberry's testimony was somewhat unclear, but it appears that she generally worked between 46 and 56 hours per week.  Tr. 170–71.  Woodberry was financially independent during the time she worked at Prince George.  Tr. 92.  Woodberry indicated that her intention was to work as a CNA until she was 70 years old, although she admitted that she did not know if she could handle working that long.  Tr. 96, 167.  Since the accident, Woodberry has not been able to return to work as a CNA.  Tr. 280.  She cannot pay her own bills and has had to get money from her daughter and son.  Tr. 123.

18.    Woodberry has been limited in other ways since the accident.  Woodberry and her older sister Ivanell Sumpter ("Sumpter") would go to dinner and movies, go on walks, and take long trips prior to the accident.  Tr. 60–61, 92.  Since the accident, they no longer take trips together, go to movies, or go on walks.  Tr. 77.  Woodberry also enjoyed planting a garden with a friend prior to the accident, but can no longer do so.  Tr. 93, 120.  While Woodberry used to wear dresses, skirts, and high heels, she no longer does because of the scar on her leg.  Tr. 93, 120, 126; see Pl.'s Ex. 10.

7

19.    Sumpter testified that following the accident, Woodberry was unable to do housework that she could do before the accident.  Tr. 68.  Sumpter would come many mornings to help Woodberry do things she could not do and other family members would also come help.  Tr. 66, 69.  However, Sumpter noted that she has not been to Woodberry's house to provide assistance "for a while."  Tr. 74.  Following the accident, Woodberry was not able to drive because of the pain in her legs and Sumpter or other family members would provide transportation, including to her physical therapy appointments.  Tr. 71–72, 75–76.  Woodberry had to walk with a cane after the accident and still does at times, depending on how she feels.  Tr. 126.

20.    Woodberry is able to do more now than she could immediately following the accident.  Tr. 127.  She can cook, wash dishes, do laundry, and clean her house, except for chores that require her to get on her knees.  Tr. 83, 127–28.  However, while doing her chores, Woodberry sometimes has to take a break if her leg starts bothering her.  Tr. 128.  Woodberry also took care of her granddaughers who lived with her at some point after the accident.  Tr. 208.  Woodberry can now drive herself, at least some of the time.  Tr. 79.

## II.   CONCLUSIONS OF LAW

### A.    Liability

1.    The United States is the proper defendant in this action pursuant to 28 U.S.C. § 1346(b) and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq.

2.    This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1346.

3.      The FTCA imposes tort liability on the United States only "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, and only to the extent that "a private person[] would be liable to the claimant in accordance with the law of the place where the act or omission occurred," id. § 1346(b)(1).

4.      Under the FTCA, procedural matters are governed by federal law; however, the FTCA directs courts to examine substantive legal issues pursuant to the laws of the place where the act or omission occurred.  Miller v. United States, 932 F.2d 301, 303 (4th Cir. 1991) ("A plaintiff has an FTCA cause of action against the government only if she would also have a cause of action under state law against a private person in like circumstances.  State law determines whether there is an underlying cause of action . . . ."); Dunbar Corp. v. Lindsey, 905 F.2d 754, 757 (4th Cir. 1990) ("United States liability under the FTCA depends upon state law.").  In this case, Woodberry alleges that Richardson acted negligently while driving in South Carolina.  Therefore, South Carolina law governs this action because South Carolina is the site of the alleged tort.  28 U.S.C. § 1346(b)(1).

5.      To establish a cause of action in negligence, three essential elements must be proven:  (1) a duty of care owed by the defendant to the plaintiff; (2) the breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach of duty.  Bishop v. S.C. Dep't of Mental Health, 502 S.E.2d 78, 82 (S.C. 1998).

6.      Under the doctrine of comparative negligence, "a plaintiff in a negligence action may recover damages if his or her negligence is not greater than that of the defendant."  Nelson v. Concrete Supply Co., 399 S.E.2d 783, 784 (S.C. 1991).

7.     At the conclusion of trial, the court granted Woodberry's motion for a directed verdict on the issue of liability, while preserving the issue of whether she was comparatively negligent.  The court now finds that Woodberry was not comparatively negligent.  There is no evidence that Woodberry failed to exercise reasonable care in operating her car.  The mere fact that Richardson, who did not testify at trial, was a postal worker does not support the inference that Woodberry should have somehow presumed that Richardson would make a left turn in front of her without giving any warning whatsoever.  Additionally, despite the government's suggestion, there is no evidence that Woodberry was distracted at the time of the accident.  See Tr. 100 (Woodberry testifying that she was not distracted at the time of the accident), 148–50 (Woodberry testifying that although she asked her granddaughter to turn the radio down, that did not happen right before the accident).  Therefore, Woodberry is entitled to a full recovery for damages proximately caused by the accident, as laid out below.

**B.     Damages**

8.     At the outset, the court notes that pursuant to 28 U.S.C. § 2675 and the court's October 9, 2014 order, Woodberry is limited to recovering the amount of damages sought in her administrative complaint—$1 million.

9.     The elements of damage that can properly be considered in determining the amount Woodberry is entitled to recover include her:  past and future medical expenses, past and future loss of income, loss of family services, pain and suffering, loss of enjoyment of life, mental anguish, and disfigurement.  Bates v. Merritt Seafood, Inc., 663 F. Supp. 915, 935 (D.S.C. 1987).  "[T]he existence or amount of damages may not be left to conjecture, speculation or guess."  Pearson v. Bridges, 544 S.E.2d 617, 619 n.5

10

(S.C. 2001).  "A party need not, however, prove future damages in a personal injury case to a mathematical certainty."  Campbell v. Paschal, 347 S.E.2d 892, 901 (S.C. Ct. App. 1986).

10.     Future damages are only recoverable if they are "reasonably certain" to occur.  Pearson, 544 S.E.2d at 619.  Woodberry was 62 years old at the time of trial. According to the life expectancy tables found at S.C. Code § 19-1-150, she is projected to have a life expectancy of 22.47 years as of the date of trial.  S.C. Code § 19-1-150 also provides that the court should consider other evidence as to Woodberry's health, constitution, and habits in determining her life expectancy.  Having considered the evidence presented in this case, including evidence of only relatively minor pre-existing medical conditions, the court finds that the life expectancy tables' estimate of Woodberry's life expectancy—84.47 years—is a reasonable estimate and will use that figure when determining Woodberry's future damages.

11.     Before the court considers each category of damages, it is necessary for the court to consider the issue of mitigation of damages.

12.     Defendant argued at trial that Woodberry has failed to mitigate her damages by wavering about whether to have a total knee replacement.  See Tr. 119 (when asked if it was her intention to have a total knee replacement, Woodberry replied:  "Not if I can help it"), 187 ("Q.  Okay.  So having total knee replacement is your game plan, correct?  A.  I don't know right now.").  However, the government failed to plead failure to mitigate in either its initial answer or its answer to Woodberry's amended complaint. Federal Rule of Civil Procedure 8(c) provides that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense."  Even though it is not

11

specifically listed in Rule 8(c), "[m]ost federal courts . . . regard the failure to mitigate as an affirmative defense under Rule 8(c)." Frederick v. Kirby Tankships, Inc., 205 F.3d 1277, 1286 (11th Cir. 2000) (collecting cases); see also Creative Commc'n Servs., Inc. v. Travelers Prop. & Cas. Co. of Am., 2011 WL 11735816, at *1 (S.C. Ct. App. Dec. 5, 2011) (holding that mitigation of damages was an affirmative defense that must be pleaded under the South Carolina Rule of Civil Procedure 8(c)). The Fourth Circuit has held that an affirmative defense must be pleaded under Rule 8(c) and that failure to do so may result in waiver. S. Wallace Edwards & Sons, Inc. v. Cincinnati Ins. Co., 353 F.3d 367, 373 (4th Cir. 2003). "Such waiver, however, should not be effective unless the failure to plead resulted in unfair surprise or prejudice." Id. (citing Brinkley v. Harbour Recreation Club, 180 F.3d 598, 612 (4th Cir. 1999)).

13.    The court assumes for the purposes of this order, without deciding, that the government has not waived the affirmative defense of failure to mitigate. Therefore, the court will determine whether Woodberry has a duty to mitigate her damages by having total knee replacement surgery.

14.    "A party injured by the acts of another is required to do those things a person of ordinary prudence would do under the circumstances, but the law does not require him to exert himself unreasonably or incur substantial expense to avoid damages." Baril v. Aiken Reg'l Med. Ctrs., 573 S.E.2d 830, 838 (S.C. Ct. App. 2002). "Whether the party acted reasonably to mitigate damages is ordinarily a question for the [factfinder]." Id. "[T]he party who claims damages should have been minimized has the burden of proving they could reasonably have been avoided or reduced." Moore v. Moore, 599 S.E.2d 467, 478 (S.C. Ct. App. 2004).

15.     The court has been unable to find any South Carolina state court case discussing whether a plaintiff has a duty to mitigate damages by having major surgery. However, the Fourth Circuit has held that, under federal law, "[i]t is the duty of a plaintiff to minimize his damages by submitting to reasonable treatment and the test in each case is one of reasonableness to be determined by the triers of fact." Ambrose v. Norfolk Dredging Co., 284 F.2d 802, 803 (4th Cir. 1960). Likewise, the Fifth Circuit has held that "[i]f a reasonably prudent person would submit to the operation, then those damages that the operation would have alleviated are not recoverable." Verrett v. McDonough Marine Serv., 705 F.2d 1437, 1444 (5th Cir. 1983) (citing Cline v. United States, 270 F. Supp. 247 (S.D. Fla. 1967)). Consistent with Ambrose and Verrett, two well-respected authorities have emphasized various factors for courts to consider in determining whether a reasonable person would submit to surgery, including the risk, pain, or inconvenience caused by the surgery—especially the risk of further injury or death—and the surgery's probability of success. See 22 Am. Jur. 2d Damages § 385 ("Among the factors considered when determining whether a reasonable person, under all the circumstances, would submit to surgery and, thus, mitigate damages is the risk, pain, or inconvenience caused by the surgery."); W.E. Shipley, Duty of Injured Person to Submit to Surgery to Minimize Tort Damages, 62 A.L.R.3d 9 (1975) ("Pre–eminent among [factors considered in determining whether a reasonable person in the plaintiff's circumstances would resort to surgery] appear to be the degree to which the recommended surgery involves a threat of further injury or death, and the strength of the probability that the operation will be successful in alleviating the condition or effecting a cure.")

13

16.     During trial, total knee surgery was described as a "major" surgery, Tr. 539, which has a number of risks:  bleeding, need for blood transfusion, infection, continued pain, fracture, and need for future revision surgery.  Tr. 575; Hartsock Dep. 32–33.  Additionally, while there was testimony that the success rate for the surgery is fairly high, Tr. 526–29, Dr. Hartsock indicated that around 15 percent of patients are less than satisfied with the results of surgery.  Hartsock Dep. 81.  Moreover, total knee replacement is an elective surgery that involves substantial inconvenience, including hospitalization, pain and pain medication, anxiety, restricted movement, home health care to help with activities of daily living, transportation to and from follow-up visits and treatment, and either outpatient or in-home physical therapy (or both).  See Pl.'s Ex. 25.

17.     Considering the risk, inconvenience, and pain that would result from a total knee replacement surgery, the fact that it is a major surgery, and the not insignificant chance that Woodberry would be less than satisfied with the outcome, the court finds that a reasonable person in Woodberry's situation could refuse to submit to a total knee replacement.  Therefore, Woodberry's desire not to undergo a total knee replacement does not constitute a failure to mitigate damages.

18.     The court now considers the amount of damages to which Woodberry is entitled.

### 1.     Medical Expenses

19.     "[I]n personal injury actions the plaintiff may recover for the necessary and reasonable expense caused by the injury such as amounts necessarily paid for medicine, medical attendance, hospital expense and care and nursing."  Sossamon v. Nationwide Mut. Ins. Co., 135 S.E.2d 87, 91 (S.C. 1964).  "A plaintiff in a personal

injury action seeking damages for the cost of medical services provided to him as a result of a tortfeasor's wrongdoing is entitled to recover the reasonable value of those medical services, not necessarily the amount paid."  Haselden v. Davis, 579 S.E.2d 293, 295 (S.C. 2003).

### a.     Past Medical Expenses

20.     As an initial matter, the government argued at trial that the court should consider the amount paid by insurance in determining the reasonable value of medical services.  The government's argument is based on two South Carolina Supreme Court cases.  In Haselden, the court held that the amount of Medicaid payment and the amount billed by the doctor were both admissible to establish the amount of the plaintiff's damages and that the amount "written off" by healthcare providers could be recovered. 579 S.E.2d at 294.  Only a year later, the court held that the collateral source rule is implicated by the consideration of the amount actually paid by insurance and affirmed the trial court's exclusion of the amount actually paid.  Covington v. George, 597 S.E.2d 142, 144 (S.C. 2004).  In doing so, the court limited Haselden to its facts.  Id.  Based on the South Carolina Supreme Court's decision in Covington, the court declines to consider the actual amount paid in this case and finds that the amounts billed in this case are persuasive evidence of the reasonable value of the services.

21.     Woodberry's medical expenses from the time immediately following the accident are undoubtedly necessary and reasonable expenses caused by the injury, including her bills for:  ambulance transportation both from the accident site to Georgetown Memorial and from Georgetown Memorial to MUSC; her stay at Georgetown Memorial; her stay at MUSC, including treatment and surgery there; and her

15

first round of physical therapy at Three Rivers.  Pl.'s Exs. 11–15, 17.  These expenses

total $85,836.85.

22.     Additionally, the court finds that Woodberry's follow-ups with MUSC,

including multiple x-rays, multiple follow-ups with Dr. Hartsock, and surgery to remove

the hardware in her knee were all necessary and reasonable medical expenses caused by

the injury suffered in the accident.  Pl.'s Exs. 14–15.  These expenses total $21,540.00.

23.     The court awards Woodberry $559.86 for a ramp she had installed at her

home following the accident as a necessary and reasonable expense.  Pl.'s Ex. 20.

24.     There are four items on Woodberry's list of past medical bills, Pl.'s Ex.

19, that require more attention.  The first is Woodberry's inpatient rehabilitation at

Carolinas Hospital.  Although Dr. Hartsock testified that the initial plan was to discharge

Woodberry to go home, he noted that the physical therapy assessment on her discharge

recommended that she go to acute rehabilitation, so she was accepted at Carolinas

Hospital.  Hartsock Dep. 44.  The court finds that, based on the physical therapy

assessment recommending she go to inpatient rehabilitation, her treatment at Carolinas

Hospital following the accident was reasonable and necessary.  This expense was

$52,522.45.

25.     Next, the court considers Woodberry's second round of physical therapy

at Three Rivers.  Dr. Howell testified that this second round of physical therapy was

reasonable and medically necessary.  Tr. 235.  Dr. Hartsock noted that a patient

undergoing physical therapy more than six months after an operation would be "a little

bit unusual, but not that unusual."  Hartsock Dep. 18.  Dr. Kerri Kolehma ("Dr.

Kolehma") opined that as of the date of trial, Woodberry had reached a conservative

16

therapy plateau and that physical therapy would no longer help with her pain.  Tr. 502.

Dr. Wheeless indicated that at some point, physical therapy does not provide the relief

sought.  Tr. 571.  While these doctors discuss a point at which physical therapy is no

longer effective, none of them specifically opined that Woodberry had reached that point

in early 2013.  Therefore, the court accepts the testimony of Dr. Howell, who treated

Woodberry at that time, and finds that Woodberry's second round of physical therapy

was reasonable and medically necessary.  This expense totaled $1,335.00.

      26.    Woodberry's list of medical bills includes expenses for seeing Dr. Faile

from September 2009 to January 2011.  Pl.'s Ex. 19.  However, there are no medical bills

from Dr. Faile in the record.  Moreover, a review of Dr. Faile's medical records indicates

that Woodberry saw Dr. Faile for a variety of issues over many years.  See Def.'s Ex. 28.

Additionally, Dr. Faile did not testify at trial and Woodberry objected to the government

putting his deposition into evidence after the close of trial.  Quite simply, the court does

not have enough information before it to determine whether visits to Dr. Faile were

reasonable and necessary expenses as a result of the accident.  Even if some of the visits

were reasonable and necessary, the court is completely unable to determine what fraction

of the expenses was attributable to the accident.  Therefore, the court declines to award

damages for visits to Dr. Faile.

      27.    Similarly, Woodberry's list of medical bills also includes bills from CVS

Pharmacy.  Pl.'s Exs. 19, 24.  Most of the medications on the list were prescribed by Dr.

Faile.  Pl.'s Ex. 24.  Without his testimony, it is impossible for the court to determine

whether they were related to the accident.  Woodberry can recover for medications

prescribed by Dr. Hartsock, which total $34.19.

28.    Based on this evidence, the court awards Woodberry $161,828.35 in past medical expenses.

### b.    Future Medical Expenses

29.    Dr. Charlyne Raih ("Dr. Raih"), a physical therapist and life care planner, produced a life care plan for Woodberry. Tr. 339.  In doing so, Dr. Raih reviewed Woodberry's medical records and went to her home to interview her. Tr. 339–40.  Dr. Raih opined that Woodberry would need to be seen by Dr. Hartsock until she decides she is ready for a total knee replacement, as well as annual visits to her primary care doctor. Tr. 342.  Dr. Raih also included in Woodberry's life care plan a total knee replacement and rehabilitation following the surgery.  Tr. 342.  Dr. Raih suggested that Woodberry wait until age 69 for her total knee replacement because that would prevent the need for a future revision.  Tr. 348.

30.    The court accepts certain aspects of Dr. Raih's life care plan.  However, the court finds that many of the items provided for are not reasonable and necessary expenses which are reasonably certain to occur.  Most obviously, Woodberry may not recover the cost of a total knee replacement and related expenses since she has indicated she does not plan to have the surgery.  The related expenses include physical therapy following total knee replacement, a CT scan, yearly x-rays, and transportation associated with the total knee replacement.  To the extent Dr. Raih includes in her life care plan annual visits with Dr. Hartsock (including transportation to Dr. Hartsock's office) and yearly injections until Woodberry undergoes a total knee replacement, there is no indication that these are reasonable and necessary expenses which are reasonably certain to occur.  At the time of trial, Woodberry had not visited Dr. Hartsock in more than two

18

years and Dr. Hartsock never indicated that it was necessary for her to return.  With regard to the injections, the court notes that Woodberry received relatively brief relief from her first injection from Dr. Hartsock and has not attempted to receive another in the two years since.  Therefore, the court does not award the future damages associated with visiting Dr. Hartsock.

31.     Dr. Raih also includes medications in her life care plan.  However, Dr. Raih indicated that the only thing she did to determine Woodberry's medications was to look at Woodberry's pill bottles and write down the prescriptions.  Tr. 372–73.  Moreover, as discussed above, because Dr. Faile has not testified, the court cannot determine that the medications he prescribed were all necessary and reasonable as a result of the accident.  The court notes that Dr. Raih's life care plan estimates an annual cost of medications that is nearly twice as much as Woodberry is seeking in prescription expenses from September 2009 to March 2014.  Compare Pl.'s Ex. 25, with Pl.'s Ex. 19.  Therefore, the court does not award damages for future medication.

32.     The court also finds the record lacking any reference to any serious injury in Woodberry's left knee.  To the extent Dr. Raih includes treatment for the left knee in her life care plan (although she does not provide an estimated cost), the court finds that such expenses are neither reasonable nor necessary.

33.     To the extent Dr. Raih's life care plan provides for household upkeep and maintenance, the court instead uses the calculations set forth below regarding loss of personal services.

34.     Based on the evidence presented, the court finds that the following items in Dr. Raih's life care plan are reasonably necessary future medical expenses which are

19

reasonably certain to occur: routine visits to her primary care physician; diagnostic lab testing; and transportation to see Dr. Faile. See Pl.'s Ex. 25. Therefore, the court awards Woodberry $12,511.31 in future medical expenses.

## 2.    Loss of Earning Capacity

35.    "Loss or impairment of earning capacity, consequent to the injuries to the person, is a proper element of compensation." Matthews v. Porter, 124 S.E.2d 321, 328 (S.C. 1962). In order to award damages for loss of earning capacity, the court must determine, from the evidence, Woodberry's ability to work following the accident. There is no evidence that Woodberry is or will be able to return to work as a CNA. The question for the court is whether Woodberry could perform a less physically demanding job.

36.    Dr. Charles Vander Kolk ("Dr. Vander Kolk"), a certified rehabilitation counselor, interviewed Woodberry in October of 2012[1] and reviewed her medical records. Tr. 408–09, 415–16, 420, 425. After performing this vocational evaluation, Dr. Vander Kolk opined that Woodberry is 100% vocationally disabled. Tr. 432. He based his opinion on Woodberry's age, her education,[2] the transferability of her skills, her significant pain, her physical limitations, the competitiveness of the job market, and problems with transportation. Tr. 428–34. Dr. Vander Kolk determined that Woodberry would not qualify for any of the open jobs in Georgetown or Williamsburg Counties in

---

[1] Dr. Vander Kolk could not recall whether he or his wife initially interviewed Woodberry. Tr. 436. The court does not find this uncertainty to be a reason to discredit Dr. Vander Kolk's testimony.

[2] Although Dr. Vander Kolk initially incorrectly indicated that Woodberry did not have her GED, Tr. 428, he later said that even though Woodberry did have her GED, it would not change his conclusion. Tr. 434.

2012.  Tr. 432.  Moreover, Dr. Vander Kolk cited reliability in opining that Woodberry could not even perform a sedentary job like that of a receptionist on a part-time basis, noting that she could only do the job "[w]hen she's having the better part of a good day." Tr. 451.  Dr. Vander Kolk interviewed Woodberry again within a month of trial and indicated that nothing Woodberry said in that interview changed his conclusions, noting that "the general picture is that there was no substantial change."  Tr. 426.

     37.     Dr. Vander Kolk's opinion differs from the opinion given by Phillip Lowe ("Lowe"), a physical therapist and certified disability examiner.  Lowe performed a functional capacity examination on Woodberry on May 2, 2011.  Tr. 269–70.  After examining Woodberry and reviewing her medical records, Lowe concluded to a reasonable degree of certainty that she has a 27% lower extremity impairment.  Tr. 285–86.  Lowe opined that Woodberry:  could stand for an hour before taking a break; could sit without limitation; could walk for up to 10 minutes and for up to a third of the day; could bend frequently and reach constantly; could climb only a couple of steps unless there were handrails; and could not squat, kneel, or crawl.  Tr. 278–279.  Lowe placed Woodberry in the sedentary light level for physical demand classification.  Tr. 279. Lowe indicated that being a receptionist at a medical or legal office was a good example of sedentary light work.  Tr. 301.

     38.     Dr. Kolehma also disagreed with Dr. Vander Kolk's opinion that Woodberry is totally vocationally disabled, noting that there "could be some other jobs she could possibly do."  Tr. 524.

     39.     After careful consideration of all the evidence in this case, the court accepts Dr. Vander Kolk's testimony and determines that, since the accident, Woodberry

21

has been and will continue to be 100% vocationally disabled.  The court also finds that Dr. Vander Kolk's focus on the job market in Georgetown and Williamsburg Counties (and his decision not to expand it to include Charleston or Berkeley Counties) was reasonable considering Woodberry's difficulty with driving.  Although the record indicates that she can drive herself at least some of the time, Tr. 79, there is no indication that she could endure a lengthy commute twice each day.

### a.     Past Loss of Earning Capacity

40.     Because the court finds that Woodberry was 100% vocationally disabled between the time of the accident and the time of trial, she is entitled to damages for her loss of earning capacity during that time.

41.     Dr. Oliver Wood, Jr. ("Dr. Wood"), an economic expert in the evaluation of economic loss in personal injury cases, opined that Woodberry's income in 2008—the year before the accident—is the best indicator of her earning capacity.  Tr. 463.  The court agrees.  In 2008, Woodberry earned $25,083.00.  Tr. 462–63.  Dr. Wood calculated that from August 11, 2009 until the date of the trial, Woodberry's loss of earning capacity totaled $118,141.00.  Tr. 465; Pl.'s Ex. 26.  That total did not include cost of living increases, productivity increases, or promotions.  Tr. 465.

42.     Based on this evidence, the court awards Woodberry $118,141.00 for her past loss of earning capacity.

### b.     Future Loss of Earning Capacity

43.     Because the court finds that Woodberry will be 100% vocationally disabled for the remainder of her life, she is entitled to damages for her future loss of earning capacity.

22

44.     As discussed above, Woodberry indicated that her hope was to work as a CNA until she was 70 years old.  Tr. 96, 167.  Moreover, Dr. Wood testified that CNAs often work into their late 60s and early 70s because there is a high demand for CNAs and because they can often not maintain their standard of living on Social Security benefits alone.  Tr. 474.  Considering the evidence that Woodberry was active and enjoyed her job prior to the accident, as well as evidence that she was a motivated and hard worker, the court finds that Woodberry would have worked as a CNA until age 70 if not for the accident.

45.     Dr. Wood, again using Woodberry's 2008 income as the best estimate of her future earning capacity, assumed that Woodberry would receive pay increases of 2.44% per year, which is equal to the average annual increase in the Consumer Price Index from 1992 to 2013.  Tr. 466.  However, he did not include any promotions or merit increases in her salary.  Based on this amount, Dr. Wood determined that her future earning capacity from the date of trial to age 70 was $212,130.00.  Tr. 466; Pl.'s Ex. 26. When discounted to present value, the total was $171,320.00.  Tr. 466.

46.     Based on this evidence, the court awards Woodberry $171,320.00 for her future loss of earning capacity.

### c.     Loss of Personal Services

47.     Dr. Wood also calculated damages for both past and future loss of personal services.  Dr. Wood calculated, based on an interview with Woodberry, that she spent about 28 hours per week, or 4 hours per day, doing chores before the accident.  Tr. 478–79.  Dr. Wood indicated that this estimate was reasonable based on a 40 hour work week.  Tr. 478.  As discussed above, the record is somewhat unclear regarding the

23

average number of hours per week that Woodberry worked, but the average is certainly higher than 40. That said, there is no evidence that Woodberry could not have worked for more than 40 hours per week and performed 4 hours of chores per day. Therefore, the court finds that 28 hours per week is the amount of time Woodberry spent on chores each week prior to the accident.

48. Dr. Wood considered both inside and outside chores that Woodberry did before her injury compared to those which she was able to do after. Tr. 475–76. Dr. Wood concluded that after the accident, Woodberry can only perform 14 hours of chores per week. Tr. 468. Dr. Wood then evaluated the value of the loss of personal services at a conservative $8 per hour. Tr. 464. Based on those data points, Dr. Wood calculated that the cost of loss of personal services for Woodberry was $26,378.00 between the accident and the time of trial and $75,003.00 from the time of trial for the remainder of her life expectancy. Tr. 466; Pl.'s Ex. 26.

49. Based on this evidence, the court awards Woodberry $101,381.00 for past and future loss of personal services.

### 3.    Pain & Suffering

50. "An award for pain and suffering compensates the injured person for the physical discomfort and the emotional response to the sensation of pain caused by the injury itself." Boan v. Blackwell, 541 S.E.2d 242, 244 (S.C. 2001). "Pain and suffering have no market price" and "are not capable of being exactly and accurately determined." Edwards v. Lawton, 136 S.E.2d 708, 710 (S.C. 1964). As such, "there is no fixed rule or standard whereby damages for them can be measured" and the amount of damages

24

awarded for pain and suffering is left to the sound discretion of the court in this bench trial.  Id.

51.     There is no doubt that Woodberry endured a great deal of pain on the day of the accident and has continued to endure significant pain since.  Dr. Wheeless described Woodberry's injury as a "brutal blunt force trauma where the ends of the joint are pulverized."  Tr. 555.  Sumpter indicated that Woodberry was in "a lot of pain" immediately after the accident, Tr. 63, and medical records and Woodberry's testimony indicate that almost five years after the accident she continues to endure significant pain.

52.     Based on this evidence, the court awards Woodberry $200,000.00 for past and future pain and suffering.

### 4.     Loss of Enjoyment of Life

53.     Loss of enjoyment of life "is a compensable element, separate and apart from pain and suffering, of a damages award."  Boan, 541 S.E.2d at 244.  These damages are meant to "compensate for the limitations, resulting from the defendant's negligence, on the injured person's ability to participate in and derive pleasure from the normal activities of daily life, or for the individual's inability to pursue his talents, recreational interests, hobbies, or avocations."  Id.  As with pain and suffering, "there is no exact measurement for . . . loss of enjoyment of life."  Schumacher v. Cooper, 850 F. Supp. 438, 453 (D.S.C. 1994).

54.     The record is replete with activities that Woodberry once enjoyed participating in, but is no longer able to:  going on walks; taking long trips; going to movies; playing ball; planting a garden; and wearing dresses, skirts, and high heels.

55.    Based on this evidence, the court awards Woodberry $175,000.00 for past and future loss of enjoyment of life.

### 5.    Mental Anguish

56.    "Separate damages are given for mental anguish where the evidence shows, for example, that the injured person suffered shock, fright, emotional upset, and/or humiliation as the result of the defendant's negligence." Boan v. Blackwell, 541 S.E.2d 242, 244 (S.C. 2001).  "Mental anguish is compensable only if it causes a substantial disruption in daily routine or a high degree of mental pain and distress."  22 Am. Jur. 2d Damages § 223.  Again, there is no fixed standard by which injuries for mental anguish can be measured.

57.    Following the accident, Woodberry suffered from anxiety and was unable to sleep.  Tr. 109–10.  Additionally, she testified about "crazy thoughts coming through [her] mind," including suicidal thoughts.  Tr. 111.  Woodberry testified to being depressed, Tr. 112, and Dr. Wheeless testified that he thought she was depressed, Tr. 624.

58.    Based on this evidence, the court awards Woodberry $50,000.00 for past and future mental anguish.

### 6.    Disfigurement

59.    Woodberry is entitled to a reasonable sum to compensate her for disfigurement.  Schumacher v. Cooper, 850 F. Supp. 438, 453 (D.S.C. 1994).  Woodberry now has a lengthy scar on her right leg.  Pl.'s Mot. Ex. 10.  Based on this evidence, the court awards Woodberry $5,000.00 for disfigurement.

26

### III.   CONCLUSION

Based on the foregoing, the court **FINDS AND CONCLUDES** that the United

States is liable to Woodberry in the amount of $995,181.66.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**July 16, 2015**
**Charleston, South Carolina**